UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MAURICE DRIVER,<br><br>Defendants. | CRIMINAL NO. 24-CR-254 |

### UNITED STATES' SENTENCING MEMORANDUM

Defendant Maurice Driver ("Driver"), while working as a Lead Service Attendant on an Amtrak train traveling from Washington, D.C. to Chicago, Illinois, met a female passenger ("Person 1"). When a federal law enforcement investigator asked the Defendant about his interactions with Person 1 on that train and in Chicago, the Defendant lied—repeatedly. As a result of the Defendant's multiple lies, he impeded criminal and administrative investigations into sexual assault allegations Person 1 made against the Defendant and the Defendant's inappropriate and against-policy interactions with Person 1. When the Defendant learned of the Government's investigation of this conduct, however, he promptly took responsibility and admitted that he lied when he spoke with the federal law enforcement investigator. For this reason, and consistent with the plea agreement between the parties, the Government does not oppose the imposition of a probationary sentence within the applicable United States Sentencing Guidelines (U.S.S.G or "Sentencing Guidelines") range.

### I.     PROCEDURAL BACKGROUND

On May 23, 2024, a federal grand jury sitting in the District of Columbia returned an indictment charging the Defendant with five counts of false statements, in violation of 18 U.S.C. § 1001(a)(2). On August 9, 2024, the Defendant pled guilty to count two of the indictment. Sentencing has been set for November 6, 2024.

1

## II.    FACTUAL BACKGROUND

On January 3, 2024, the Defendant was working as a Lead Service Attendant on Amtrak train 29, which departed from Union Station in Washington, D.C. at approximately 4:05pm and traveled to Chicago, Illinois, with a scheduled arrival of 8:45am on January 4, 2024. While on duty, the Defendant's responsibilities included selling and serving food to passengers in the café car. As one of his duties included ensuring that there were enough dinner portions for travelers in the sleeper cars, the Defendant had access to information about passengers on board the train, who had purchased "sleeper car" tickets, and which sleeper cars were vacant. Sleeper car tickets are more expensive and provide passengers with individual rooms that contain beds and upgraded services, such as meal delivery.

Person 1 had a coach ticket to travel from Washington, D.C. to Chicago on Amtrak train 29, and then another train ticket to travel from Chicago to Spokane, Washington. Person 1 did not have a ticket to use a sleeper car.

On January 3, 2024, after the train departed Washington, D.C., Person 1 went to the café car three times to purchase food and drinks. Each time Person 1 went to the café car, the Defendant was the Amtrak employee responsible for fulfilling food and drink orders. While in the café car, Person 1 and the Defendant had several conversations and the Defendant provided Person 1 with his personal cellular cellphone number, ending in -8770. The third time Person 1 went to the café car, Person 1 ordered food and had two alcoholic beverages, one of which the Defendant gave her for free. At some point in their conversation, the Defendant volunteered to sneak Person 1 into a vacant sleeper car for the night.

Later, the Defendant showed Person 1 which sleeper car was vacant and allowed Person 1 to spend the night in that car. While in the sleeper car during the evening of January 3, 2024,

Person 1 recalls sitting on the bed and "feeling floating," "dizzy," and "nauseous." In the middle of the night, Person 1 woke up and realized Person 1 did not have any clothes on but does not remember taking them off. In the morning, when Person 1 woke up, Person 1 felt groggy and hungover. Person 1 also felt sore and tender in her genital area and noticed bruises on her thighs and arms. Person 1 also noticed a condom wrapper on the floor. After waking up, the Defendant texted Person 1 and asked if Person 1 wanted breakfast. Person 1 ordered food, which the Defendant brought to the sleeper car, and Person 1 also took a shower.

Once the train arrived in Chicago, Person 1 left the sleeper car and got off the train, but Person 1 did not feel well. After leaving the train, Person 1 went to a McDonald's in the train station to wait for Person 1's next train to Spokane, Washington. Ultimately, Person 1 texted the Defendant, who provided Person 1 with information on where he was staying and invited Person 1 to the hotel. Once Person 1 arrived at the hotel, Person 1 tried to contact the Defendant, but the Defendant never responded. Person 1 fell asleep in the lobby waiting for the Defendant to respond to Person 1's messages, and when Person 1 woke up, Person 1 spoke to the manager at the hotel, who informed Person 1 that the Defendant had left the hotel. At this point, Person 1 had missed Person 1's connecting train to Spokane. After Person 1 woke up in the hotel lobby, Person 1 attempted to call the Defendant, but he did not answer. Person 1 also texted the Defendant that Person 1 had missed Person 1's train. The Defendant eventually responded by text and sent Person 1 a replacement ticket. Later, the hotel manager helped Person 1 get an Uber back to the train station in Chicago.

When Person 1 returned to the train station in Chicago, Person 1 went to Amtrak Police and reported that she had been sexually assaulted by an Amtrak employee. Amtrak Police escorted Person 1 to the hospital, where she consented to a rape kit and a toxicology report. Person 1 spoke

with Amtrak Police and, as part of that interview, Person 1 provided evidence of Person 1's communications with the Defendant from Person 1's cell phone.

On January 5, 2024, the Defendant agreed to a voluntary interview with an Amtrak-OIG Special Agent. During that recorded interview, the Defendant knowingly and willfully made material misrepresentations to the Special Agent, including: 1) he never brought Person 1 to a sleeper car; 2) he did not have a personal phone number ending in -8770; 3) he never provided his phone number to Person 1; 4) he never texted with Person 1; and 5) he never texted Person 1 information about the hotel he was staying at in Chicago.

### III.   THE APPLICABLE SENTENCING GUIDELINES

To determine an appropriate sentence, the Court must first accurately calculate the Defendant's advisory Sentencing Guidelines Range. *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

The Parties agree on the following Guidelines Calculation:

| Guideline | Description | Offense Level |
|---|---|---|
| § 2B1.1(a)(2) | Base Offense Level | +6 |
| § 3E1.1(a) | Acceptance of Responsibility | -2 |
| § 4C1.1 | Adjustment for Certain Zero-Point Offenders | -2 |
| Total | | 2 |

### IV.   The Appropriate Sentence Considering the Factors Set Forth in Section 3553(a)

To determine an appropriate sentence, after the Court accurately calculates the Defendant's advisory Guidelines range, it should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50. These factors include the nature and circumstances of the offense, the history and characteristics of the Defendant; and the need for the sentence to promote respect for

4

the law, just punishment, and adequate deterrence. 18 U.S.C. § 3552(a). Considering these factors, the United States does not oppose a probationary sentence. The United States also submits that imposition of a fine with the applicable Guidelines range is appropriate.

First, the nature and circumstances of the offense support a probationary sentence. Although the Defendant lied repeatedly to a federal law enforcement agent, impeding two important underlying investigations, the Defendant took prompt steps to remedy his wrongs by acknowledging he lied and entering a guilty plea. Although such conduct must be taken seriously, the Defendant has admitted his wrongdoing and accepted responsibility for his actions.

The second factor that the Court must consider in fashioning an appropriate sentence is the history and characteristics of the Defendant. The portrait set forth in the Presentence Report is not one that excuses the Defendant's behavior, nor provides a reason to depart from the guidelines.

Third, the Defendant's sentence must also reflect the seriousness of the offense to promote the rule of law, to provide just punishment, and to provide adequate deterrence. The Defendant appears unlikely to lie to law enforcement again. He promptly took responsibility for his false statements, demonstrating a respect for the rule of law.

## V.     FORFEITURE AND RESTITUTION

The Parties agree that the Court has an obligation to determine whether, and in what amount, mandatory restitution applies under 18 U.S.C. § 3663A. Here, there was no ascertainable loss to the Government or any victim that could be attributed to the Defendant's actions.

## VI.    CONCLUSION

The Defendant's conduct must not be taken lightly. Lying to federal law enforcement and impeding ongoing criminal and administrative investigations is serious—it delays justice and appropriate and necessary repercussions for misconduct. The Defendant, however, admitted his

wrongdoing and took responsibility for a false statement that he made to federal law enforcement. As such, the Government does not oppose a probationary sentence as supported by the applicable sentencing guidelines.

        Respectfully submitted,

        MATTHEW GRAVES
        United State Attorney

By:    /s/ *Rebecca G. Ross*
        Rebecca Ross (N.Y. Bar No. 5590666)
        Brian P. Kelly (D.C. Bar No. 983689)
        Assistant United States Attorneys
        601 D Street N.W.
        Washington, D.C. 20530